UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Trolis L. Kirby,

    Petitioner,

v.                                           CASE NO: 8:05-cv-1765-T-30AEP

Walter A. McNeil, Secretary,
Florida Department of Corrections,

    Respondent.
_____/

# **ORDER**

Petitioner, an inmate in the Florida penal system proceeding *pro se*, brings this petition for writ of habeas corpus pursuant to 28 U.S.C. §2254 (Dkt.12). The Court has considered the petition, Respondent's response (Dkt. 16) and Petitioner's reply (Dkt. 23). Upon review, the Court determines that the petition must be denied because Petitioner has not shown he received ineffective assistance of counsel, and the remaining ground is not cognizable for federal habeas corpus relief.

## **STANDARD OF REVIEW**

Pursuant to 28 U.S.C. §2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), enacted and effective on April 24, 1996, "a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation

of the Constitution or law or treaties of the United States." 28 U.S.C. §2254(a). Where a State court initially considers the issues raised in the petition and enters a decision on the merits, 28 U.S.C. §2254(d) governs the review of those claims. *See Penry v. Johnson*, 532 U.S. 782, 792 (2001); *see also Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003).

Habeas relief may not be granted with respect to a claim adjudicated on the merits in a State court unless the adjudication of the claim:

1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d). *Price v. Vincent*, 538 U.S. 634, 638-39 (2003); *Clark v. Crosby*, 335 F.3d 1303, 1308 (11th Cir. 2003). A State court's factual finding is presumed to be correct, and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e)(1).

## BACKGROUND

**Procedural Background**

On July 18, 2000, the State Attorney for Polk County charged Petitioner Trolis Kirby (hereinafter "Petitioner") with (1) attempted murder in the second degree; (2) sexual battery with force or a deadly weapon; and (3) robbery with a weapon. After a two-day trial, a jury

found Petitioner guilty on all charges on January 24, 2001 (Dkt. 18, Vol. 1, at R. 8-9). At sentencing, the trial court determined Petitioner was a Prison Releasee Reoffender, making him eligible for enhanced terms of imprisonment. The trial court sentenced Petitioner to life imprisonment on Count 2, and to concurrent 30 year sentences for Counts 1 and 3. The Court of Appeal upheld Petitioner's conviction per curium on April 26, 2002. *Kirby v. State*, 818 So. 2d 512 (Fla. 2d DCA 2002). The Court of Appeal denied Petitioner's motion for mandamus relief on March 25, 2003. *Kirby v. State*, 846 So. 2d 517 (Fla. 2d DCA 2003).

On September 30, 2002, Petitioner filed a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850 (Dkt. 18, Tab 6). Petitioner asserted ineffective assistance of trial counsel saying his attorney failed to interview and subpoena to testify three alibi witnesses that Petitioner argued would have provided him with alibis at the time of the crime. Petitioner argued that at the time of the crime, he was at the home of Justin Judah (hereinafter "Judah") where the two men played cards, drank beer and socialized. Petitioner stated that his sister Shanika Kirby (hereinafter "Shanika") drove him and Shanika's husband Fred Mosley (hereinafter "Mosley") to Judah's house around 6 p.m. or 6:30 p.m. on the evening of the crime. Petitioner stated that Shanika returned to Judah's home to pick up Mosley around 9:30 p.m. or 10 p.m. Petitioner stated that he remained at Judah's house until he left around 11 p.m. or 11:30 p.m.

The Polk County Circuit Court held an evidentiary hearing on Petitioner's 3.850 motion on August 21, 2003 (Dkt. 18, Tab 8). The court denied Petitioner's motion on September 4, 2003 (Dkt. 18, Tab 9). The Court of Appeal upheld the trial court per curium

on July 15, 2005. *Kirby v. State*, 908 So. 2d 1068 (Fla. 2d DCA 2005).

Petitioner filed his initial habeas corpus petition on September 8, 2005, with the U.S. District Court for the Middle District of Florida, Orlando Division (Dkt. 1). On September 19, 2005, this case was transferred to this Court (Dkt. 5). On November 15, 2005, this Court issued an order requiring Petitioner to file a properly completed and executed habeas corpus petition within 25 days (Dkt. 7). On March 23, 2006, this Court struck Petitioner's initial petition sua sponte and dismissed the case without prejudice because of Petitioner's failure to comply with the previous order (Dkt. 8).

After initially denying Petitioner's motion to reopen the case (Dkt. 9) on May 5, 2008 (Dkt. 10), this Court directed the case be reopened on May 9, 2008, and directed Petitioner to file a properly completed petition for habeas corpus within 30 days (Dkt. 11). Petitioner filed the instant petition on June 9, 2008 (Dkt. 12).

**Factual Background**

On June 26, 2000, at around 3 p.m. or 4 p.m., Lori Harper (hereinafter "Harper") reported for her job as a clerk at the Island Food Store convenience store near the corner of Winter Lake Road and Spirit Lake Road in Winter Haven, Florida. She was scheduled to work until the store closed at 11 p.m. At around 10:30 p.m., Petitioner entered the store and asked Harper the price of a bottle of alcohol. After she told Petitioner the price, he put down the bottle and left the store.

About 15 minutes later, Petitioner returned to the store and walked over to Harper who was in the back of the store. Petitioner grabbed Harper from behind by her arms and told her

that "he wanted the money." Petitioner pulled Harper behind the store's counter where the cash register was located and demanded that she tell him how to open the register. She told him, he opened the register, removed about $70 in paper bills and put the money in his pocket.

Petitioner then demanded that Harper tell him where the store's security camera tape was located. She told him it was in the store's back room. Petitioner made Harper go into the back room with him where he removed the tape from the VCR and put it in the front of his pants. The camera was still running, so Harper could see on the attached TV monitor that a young girl entered the store while she and Petitioner were still in the back room.

While Petitioner and Harper were in the back room, Winter Haven resident Josephine Redding (hereinafter "Redding") parked in front of the store with her eight-year-old granddaughter, Vanity Neal (hereinafter "Neal") in the car. Redding was driving home when she decided to stop at the store to let Neal purchase a candy bar. Redding stayed outside in the car while Neal went in to make her purchase.

When Petitioner and Harper saw Neal enter the store, Petitioner told Harper to stay in the back room, remain quiet, and he would go to the front of the store to deal with the little girl. Petitioner went behind the counter and told Neal that she could not buy the candy because the store was about to close. Neal left the store and told Redding that she could not buy a candy. Redding, a frequent customer who knew the store's employees by name, could see Petitioner through the store's front window from where she was sitting in her car and did not recognize him as a regular employee. Redding entered the store with Neal to complain

about her granddaughter being unable to buy the candy even though the store was still open.

Petitioner eventually sold Neal the candy bar and opened the register to give her change. While this was happening, Harper moved from the back room to behind the counter and mouthed "help me" to Redding. Redding thought Harper looked nervous so she and Neal left the store and drove home where she immediately called 911.

When later questioned by police, Redding could not identify Petitioner from the photopack of six pictures police showed her, but did identify Petitioner at trial. Neal identified Petitioner from the police photopack and also identified him at trial.

After Redding and Neal left, Petitioner locked the store's front door, forced Harper to the back room and made several attempts to undo her pants. Harper resisted. Next, Petitioner asked Harper where her car keys were located. Harper lied and said her husband had the keys and that the car was not working. Petitioner then grabbed Harper from behind and twisted her neck until "it popped all the way down my back." Harper fell to the ground.

Petitioner pulled Harper to her knees and grabbed a box cutter. Petitioner pulled back Harper's head and cut the front of her throat, slicing her trachea and leaving a five or six inch-long gash on her neck. Petitioner told Harper he was cutting her throat because she could identify him. Harper later identified Petitioner from the police photopack and at trial.

As Harper lay on the floor bleeding, Petitioner used an electrical cord to tie Harper's arms behind her back. Petitioner then used the box cutter to cut part of Harper's pants. Petitioner pushed aside Harper's underwear and penetrated her vagina with his finger. Petitioner then left Harper in the back room and returned to the front of the store. Harper

heard one of the store's refrigerator cooler doors slam shut.

Deputy Benito Dominguez of the Polk County Sheriff's Office responded to Redding's 911 call and arrived at the store at about 10:53 p.m. As Dominguez approached the store, he saw Petitioner peek out from behind the counter. Petitioner then stepped out from behind the counter holding a bottle of orange juice and went in front of the cash register as if trying to pay for it. Petitioner kept looking towards Dominguez.

Petitioner then walked to the front door, unlocked it and stepped outside. Dominguez ordered him to stop and show his hands, and Petitioner asked "why are you harassing me, I didn't do anything." Dominguez repeated his command and Petitioner began running across Winter Lake Road towards the St. Paul Drive area. Dominguez chased him for a few seconds but could not keep up. While Dominguez was chasing Petitioner, Harper returned to the front of the store and locked the door.

Dominguez returned to store and discovered the door was locked. Harper soon unlocked the door and Dominguez began administering medical help to Harper's injuries. Harper was transferred to Lakeland Regional Medical Center where she recovered from her injuries.

Dominguez identified a different person from the police photopack, but later identified Petitioner at trial.

James Barnes (hereinafter "Barnes"), another store employee who casually knew Petitioner and lived near the store, testified that he saw Petitioner initially enter the store while Barnes was outside the store using a pay phone. Barnes also testified that he later saw

Petitioner running away from the store. After the incident, Barnes identified Petitioner from the police photopack as the person he saw running.

Police located and arrested Petitioner two days after the incident.

At trial, the prosecution presented eyewitness testimony that Petitioner was the only person in the store besides Harper at the time of the crime. The prosecution also presented evidence that Petitioner's palm prints were found on two coin envelopes found on the floor near the store's counter, and that the coin envelopes were kept behind the counter where customers do not have access. Crime scene technicians were unable to recover usable fingerprints from the box cutter, cash register or VCR.

Petitioner declined to testify at trial and did not present his own witnesses or evidence.

## DISCUSSION

### Ground I

In support of his petition, Petitioner asserts:

> Ineffective assistance of trial counsel for failure to investigate and call alibi witnesses.

According to Petitioner, his trial counsel failed to investigate and secure testimony from "crucial defense witnesses whom counsel had been repeatedly informed would provide testimony that the [Petitioner] was with him at the time of the alleged offenses." Petitioner states that he was with Judah and Mosley at the time of the offense, and that he was the victim of misidentification.

The standard for proving ineffective assistance of counsel sets a high bar for Petitioner

to overcome. The two-prong test spelled out in *Strickland v. Washington*, 466 U.S. 668 (1984), requires a petitioner to show (1) counsel's performance was so deficient and he made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment and (2) counsel's substandard performance prejudiced the petitioner. *Id.* at 687.

The deferential standard of the first prong carries with it the strong presumption that counsel's performance fell "within the wide range of reasonable professional assistance" and that counsel's actions were "sound trial strategy." *Id.* at 689. A petitioner claiming ineffective assistance of counsel must identify acts or omissions that were not the result of reasonable professional judgment, and a court must consider whether those acts were outside "the wide range of professionally competent assistance." *Id.* at 690. Counsel's performance is not inadequate unless he did not act as "a reasonably competent attorney." *Id.* at 687-88 (internal quotation marks omitted). Courts should not evaluate counsel's performance based on what was "possible or what is prudent or appropriate" but only on "what is constitutionally compelled." *Chandler v. U.S.*, 218 F.3d 1305, 1313 (11th Cir. 2000).

The second prong, which addresses prejudice, requires a petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Petitioner has failed to show that his trial counsel's actions were outside the range of professionally competent assistance as required by the first *Strickland* prong. In Petitioner's 3.850 evidentiary hearing, Petitioner's trial counsel, public defender Guy Bradstock (hereinafter "Bradstock"), testified that Petitioner never mentioned Mosley as potential

witnesses during their pretrial conversations (Dkt. 18, Tab 8, at R. 38). Bradstock testified that Petitioner named three potential alibi witnesses, including Judah, a man named Earl whom Petitioner indicated should not be used as a witness, and another man named Darren Thomas (Dkt. 18, Tab 8, at R. 37). Bradstock contacted Thomas, but he could not provide an alibi for Petitioner at the time of the incident (Dkt. 18, Tab 8, at R. 40). Bradstock testified that Petitioner only provided Judah's first name and a description of where he lived, and that an investigator with the public defender's office made numerous unsuccessful attempts to locate Judah (Dkt. 18, Tab 8, R. 39).

After a two-month continuance, Bradstock was still unable to locate Judah by the time of trial (Dkt. 18, Tab 8, at R. 38-39). Petitioner's counsel for the 3.850 evidentiary hearing said she spoke with Judah before the trial, but was later unable to locate him to subpoena him to testify at the hearing (Dkt. 18, Tab 8, at R. 3-4).

The fact that both of Petitioner's attorneys had difficulty contacting Judah shows that Bradstock was not unreasonable in being unable to locate him and subpoena him for trial. Bradstock also testified that because of the difficulties producing alibi witnesses, he pursued a strategy of attacking the veracity of the prosecution's eyewitnesses who testified that Petitioner was at the store at the time the of the crime (Dkt. 18, Tab 8, at R. 49).

The trial transcript shows that Bradstock aggressively pointed out inconsistencies in the prosecution's eyewitnesses' memories by showing that they had different recollections of what the offender was wearing. Given Bradstock's unsuccessful attempts to secure alibi witnesses, his aggressive cross-examination of the prosecution's witnesses demonstrates that

he provided effective counsel to Petitioner.[1]

Petitioner has also failed to show that he was prejudiced by Bradstock's failure to secure testimony from alibi witnesses. Though the prosecution focused much of its testimony on eyewitness identification, witnesses also testified that Petitioner's palm print was located on two envelopes found at the crime scene (Dkt. 18, Vol. II, at R. 132-37, 161-62). The store's manager testified that the envelopes were normally kept behind the counter and not in a location where a customer would have access to them (Dkt. 18, Vol. II, at R. 103-04). This physical evidence that Petitioner was behind the counter in the store is highly persuasive. Even if Petitioner's counsel had been able to secure testimony from Petitioner's relatives and friends providing him with alibis, Petitioner has not shown that this testimony would have produced a different outcome.

For these reasons, Petitioner is not entitled to relief on this Ground.

**Ground II**

In support of his petition, Petitioner asserts:

---

[1] Furthermore, Shanika's testimony during the 3.850 hearing casts doubt on Petitioner's claim that he was with Mosley or Judah at the time of the incident. Shanika and Mosley's home at 3051 St. Paul Drive in Winter Haven is diagonally across the street from Judah's apartment at 3081 St. Paul Drive. Both residences are about 1/5 of a mile from the store where the crime occurred. Petitioner testified that he was at Judah's apartment until 11 p.m. (Dkt. 18, Tab 8 at R. 9, 12), which would have provided him an alibi for 10:45 p.m. when the offender arrived at the store. But Shanika testified that Petitioner returned to her house at 10:38 p.m., then later left by himself for about 30 minutes (Dkt. 18, Tab 8, at R. 21, 22, 25). This 30 minute window would have provided Petitioner ample time to commit the acts at the nearby store. Shanika also indicated that Petitioner was with *her* at the time of the crime, yet said she never told this to Bradstock even as her brother sat in jail for months awaiting trial (Dkt. 18, Tab 8, at R. 30).

Petitioner was denied his right to full and fair hearing as guaranteed by Due Process.

According to Petitioner, his due process rights were violated when, during his 3.850 motion evidentiary hearing, the court denied his counsel's motion for a continuance to locate and subpoena Judah to testify. Counsel learned two days before trial that Judah had not been served with the subpoena (Dkt. 18, Tab 8, at 3-4). Petitioner argues he was forced to proceed without the testimony of a witness who was willing to testify and had relevant information, and "who formed the basis of [Petitioner's] motion."

The Eleventh Circuit has held that an alleged error committed by a Florida trial court involving a 3.850 motion is not grounds for habeas relief. *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987). There is no federal constitutional requirement that a state provide a mechanism for post-conviction review of state convictions. *Williams v. State*, 640 F.2d 140, 143 (8th Cir. 1981). Therefore, the adequacy of a state post-conviction procedure does not create constitutional questions cognizable in federal habeas corpus proceedings. *Id*. at 143-44.

Petitioner's argument does not provide a cognizable question for federal habeas corpus relief. For this reason, Petitioner is not entitled to relief on this Ground.

It is therefore ORDERED AND ADJUDGED that:

1. The petition for writ of habeas corpus (Dkt. 12) is DENIED.
2. The Clerk is directed to enter judgment in favor of Respondent and against the Petitioner, terminate any pending motions, and close this file.

**DONE** and **ORDERED** in Tampa, Florida on December 9, 2009.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies Furnished To**:
Counsel/Parties of Record

*S:\Odd\2005\05-cv-1765.Trolis Kirby.wpd*